WESTINGHOUSE ELECTRIC CORP., APPELLEE, *v.* PORTERFIELD,
TAX COMMR., APPELLANT.

(No. 69-300—Decided August 5, 1970.)

*Messrs. Wright, Harlor, Morris, Arnold & Glander,
Mr. C. Emory Glander* and *Mr. John T. Lord,* for appellee.
*Mr. Paul W. Brown,* attorney general, and *Mr. W.
Robinson Watters,* for appellant.

SCHNEIDER, J. Appellee, Westinghouse Electric Corporation, in filing its franchise tax returns for each of the years 1960 to 1964, inclusive, allocated only its sales of goods and services to the "business done" fraction provided by R. C. 5733.05, and paid its corporate franchise taxes accordingly.

On June 7, 1966, Westinghouse filed applications for refund for each of those tax years, claiming that annual dividends, interest, rents and royalties received by it, as well as its annual gross receipts from sales and dispositions of tangible property (other than goods manufactured by it)

and of securities owned by it should also be considered "business done," within the meaning of R. C. 5733.05 and Rule 275 of the Tax Commissioner, and business "activities" as contemplated by Rule 276 of the Tax Commissioner. The Tax Commissioner denied the refunds. Upon appeal, the Board of Tax Appeals reversed and allowed the same. The Tax Commissioner now appeals to this court.

No legislation other than the so-called "business fraction" of the franchise tax computation is involved. Former R. C. 5733.05 (126 Ohio Laws 747), set forth the language applicable as "a fraction whose numerator is the value of the business done by the corporation in this state during the year preceding the date of the commencement of its current annual accounting period, and whose denominator is the total value of its business during said year wherever transacted."

Inasmuch as "value of the business done" is nowhere defined or explained in R. C. 5733.01 *et seq.*, the Tax Commissioner adopted Rules 275 and 276 to supply the deficiency.[1] They were in effect during the tax years in question, and read in full as follows:

Rule 275. "Business done in and out of Ohio by corporations subject to the payment of franchise taxes shall be determined under Section 5733.05, Revised Code, by allocating to the business fraction, therein provided, sales in and out of Ohio.

"All sales of goods from warehouses in Ohio, whereever manufactured, shall be considered as Ohio sales.

---

[1]R. C. 5733.05 has been amended twice subsequent to the last tax year involved in this case. At first glance, it would appear that the substance of Rules 275 and 276 have been incorporated into those amendments, a question which we do not decide but consider immaterial to the issues which are to be resolved on the state of the law and the rules existing at the time of the tax years involved.

Rules 275 and 276, were originally promulgated in 1939, redesignated "TX-43-01" and "TX-43-02," respectively, in 1966, and repealed contemporaneously with the effective date (December 1, 1967), of the first subsequent amendment to R. C. 5733.05.

"In the case of manufacturing companies, all sales of goods manufactured in Ohio, wherever sold, shall be considered as Ohio sales, except sales of such products as are sold from warehouses outside of this state.

"The denominator of such business fraction shall in all cases be the total sales wherever made."

Rule 276. "Corporations, whose business does not consist in the making of sales and to which Rule 275 cannot apply but which business consists in such activities as receiving commissions, rents, interest, dividends, fees, etc., shall be determined by allocating such business activities in and out of Ohio according to their situs."

One of the Westinghouse exhibits in the record illustrates precisely the question involved. The following columns therefrom are shown for the tax year 1962 only, for the reason that the bulk of the testimony in the case was directed to that year as a typical example:

Westinghouse Electric Corporation
Ohio Franchise Tax
Business Done In and Out of Ohio
1960 through 1964.

| Ohio Franchise Tax Year | | 1962 |
|---|---|---|
| Calendar Year | | 1961 |
| *Receipts From:* | *Ohio* | *Total* |
| 1. Sales of Goods and Services | $187,014,125 | $1,830,990,049 |
| 2. Dividends | . . . . . . . . . . . | 5,093,944 |
| 3. Interest | . . . . . . . . . . . | 10,774,818 |
| 4. Rents | 10,760 | 66,631 |
| 5. Royalties | . . . . . . . . . . | 10,245,612 |
| 6. Sales & Dispositions of Tangible Property | 53,955 | 1,915,245 |
| 7. Sales & Dispositions of Securities | . . . . . . . . . . . | 604,111,277 |
| Totals | $187,078,840 | $2,463,197,576 |

With reference to Item 1 on the above table, we immediately note that it is entitled "Sales of Goods and

*Services.''* (Emphasis supplied.) The totals shown opposite that item represent unchallenged figures which Westinghouse used to compute its original franchise tax and represent the starting point for its claimed refunds. We note also that the record contains several other unchallenged references to those totals as containing receipts from sales of goods as well as receipts from services rendered by Westinghouse.

It appears to us, then, that Westinghouse's emphatically repeated contention that the proper question in this case is whether the Tax Commissioner was correct in treating his Rules 275 and 276 as mutually exclusive is completely answered by the fact that he did apply a combination of formulas contained in both rules to Westinghouse as to Item 1 activities.

Rule 275 comprehends solely tangible goods sold from inventory, whether or not manufactured by the taxpayer. On the other hand, Rule 276 contemplates receipts from ''commissions'' and ''fees,'' of which ''services'' is an equivalent.

Having applied both rules to Item 1 activities, the Tax Commissioner should not be permitted to exclude the activities represented by Item 2 (gross receipts from dividends from permanent investments in subsidiaries and licensees), Item 3 (gross receipts from interest from the securities involved in Item 7 as well as from advances and loans to subsidiaries, licensees and customers), Item 4 (gross receipts from rents from real estate held throughout its territory of operations) and Item 5 (gross receipts from royalties on patents and licensing agreements to various other entities). Surely, all of these items are expressly or impliedly contemplated by Rule 276. The Board of Tax Appeals was therefore correct in deciding for Westinghouse as to such items, although not for the reasons set forth in its written decision.

It does not follow, however, from the conclusion that provisions of both rules are applicable to the instant facts to the extent of Items 1 through 5, that either sales and

dispositions of tangible property (Item 6) or sales and dispositions of securities (Item 7) should be included in the fraction as representative of the "value of the business done" by Westinghouse.

The taxpayer has not attempted to justify a construction of the literal terms of either rule so as to include either of those items. On the other hand, the Tax Commissioner has not attempted to furnish a clue as to why they should not be considered so included. The question, however, loses none of its relevancy by the mere failure of either party to answer it or to assist us in its solution.

It seems eminently clear that the phrase, "such activities as receiving commissions, rents, interest, dividends, fees, etc.," contemplates the named activities and like activities whereby proceeds are received from the use of labor or property. But, that language leaves no room for the inclusion of gross receipts collected from the disposition of capital items such as are represented by Items 6 and 7.

Parenthetically, it should be noted that the Tax Commissioner does not concede that only gross *profits,* as distinguished from gross *receipts,* from those activities are within the scope of Rule 276 or are a reasonable measure of the value of Westinghouse's business activities in Ohio compared to its total activities. Neither does Westinghouse make a like concession.

Moreover, as to Item 6, there is no evidence that that activity was undertaken to realize gain or profit arising from appreciation on Westinghouse's capital investment. Furthermore, there is a total absence from the record of any evidence that the disposition of used or surplus capital equipment (tools and machinery used in its manufacturing sales and installation activities) was undertaken for reasons other than for the recovery of such investment therein. Thus, the definition of business as including "all enterprises conducted for gain, profit, or income" R. C. 5701.08 (126 Ohio Laws 78), as contended for by Westinghouse, could not apply to this item on the facts of this case.

Turning to Item 7, to which Westinghouse directs the

greater force of its argument (for the good enough reason that it underlies the bulk of the claimed refunds), this appeal might be decided upon the narrow ground that the record unequivocally reveals that the supporting totals include gross receipts from the sales of substantially "short term" or readily marketable securities[2] which were purchased in part with surplus cash belonging to various subsidiaries of Westinghouse. No attempt was made to divide the totals into amounts representing securities belonging to Westinghouse and securities belonging to its subsidiary companies.

It is to be recalled that franchise tax returns must be filed by individual corporations and a consolidated return may not be filed on behalf of subsidiary entities. (Cf. R. C. 5711.14, with reference to corporate personal property taxpayers, and R. C. 5725.14, with reference to an incorporated dealer in intangibles.) Therefore, the inclusion of the only totals appearing in the record for Item 7 activities, for each year in question, in the "business done" fraction of Westinghouse, would unreasonably distort the business activities of the single taxpayer here, even assuming that such activities are otherwise properly includible in that fraction.

The question raised by the Item 7 activities might also be resolved upon a second narrow ground. There is no showing that Westinghouse holds itself out to either this state, the general public, or its stockholders as an investment company or even that it is engaged in investment activities. The original returns for the years here involved contain the following uniform statement in response to the information required as to the "nature of business in which engaged": "manufacture, sale and installation of electrical and steam apparatus."

We prefer, however, to rest our decision as to Item

---

[2]U. S. Treasury Bills and other federal securities, state and local obligations, and a small percentage of private commercial paper which were purchased in part with surplus cash belonging to various subsidiaries of Westinghouse.

7 upon a broader foundation, as a surer guide to the Tax Commissioner and to Westinghouse and all other taxpayers similarly situated.

Westinghouse relies strongly upon its assertion that "the uncontradicted testimony of appellee's witnesses (R. 46-73) clearly show (*sic*) that the omitted receipts from these activities were an *essential, integral* part of the total corporate activities of appellee . . . ." (Emphasis supplied.)

First of all, the sole witness who testified as to Item 7 activities was the assistant treasurer of Westinghouse charged with the responsibility of cash control and the purchase, with temporary surpluses of cash, and the sale, when cash was needed, of readily marketable securities.

No indication was given as to the size of the staff assisting him in such activities, which consisted of some 400 transactions per year[a] divided equally between purchases and sales, and which accounted for gross receipts, averaging for each of the five years involved, almost 800 million dollars per year as compared to average yearly total gross receipts from the same period of 1,880 million dollars from all of Westinghouse's activities in the "manufacture, sale and installation of electrical and steam apparatus."

It should be noted further that the generation of 800 million dollars worth of receipts on the average results from the turning over of an average cash and securities balance in each year of 250 million dollars, of which only a small part is included in the numerator (Ohio) of the *property* fraction of the franchise tax formula for the reason that the cash control and security investing activities were centered in the Westinghouse headquarters in Pittsburgh, Pennsylvania.

Exhibit 23, introduced through the witness without objection, is a document written by him which more fully

---

[a]In other words, on the average, some 200 transactions involving the purchase, and a like number involving the sale, of a total of 600 million dollars worth of securities occurred each year. This is less than one transaction per working day and involves, on the average, 3 million dollars per transaction.

explains the adopted policy of Westinghouse in regard to Item 7 activities, as follows:

"In order to avoid maintaining an excessive amount of cash to meet daily requirements, a policy of centralized cash control has been adopted. This means that all cash received and disbursed by the company is coordinated and controlled at one point, the Treasury Department.

". . . This enables us to maintain bank balances at minimum levels commensurate with the service being rendered by each bank and to invest the excess cash in marketable securities. . . .

"This rapid means of communicating advice of deposits and disbursements and of transferring funds reduces the time that money is in transit and consequently reduces the amount of cash required to run the company. Upwards of $500 million is transferred every month from one account to another in this manner. Another example of the velocity at which our money moves is that if on any particular day we had $50 million in cash, this cash would be gone in about 5 workdays and replaced with other dollars.

"Marketable security investments result from the investment of corporate cash that is in excess of the amount required to operate the company from day to day. Each morning our precise cash position is determined and securities are either bought or sold to adjust cash.

"Since these investments represent corporate cash temporarily not needed, it is important that it be invested in securities that possess a high degree of safety and marketability and which have a relatively short maturity . . . .

". . . It is often necessary within a matter of hours to supplement the daily cash position through the sale of marketable securities in amounts as large as $10 to $15 million. . . .

". . . The securities outlined in the policy, except for tax exempt municipals, are highly marketable and can be sold in the short-term money market in large quantities within a matter of minutes.

"During the course of a year, approximately $2 billion

of securities are bought and sold in the daily process of adjusting our cash position. The marketable securities portfolio at December 31, 1967 amounted to $15 million and has been as high as $359 million in prior years. The earnings from the portfolio vary depending upon the amount available for investment and the prevailing market prices. As a result, the annual income and capital gains earned on the marketable securities has ranged between $9.7 million and $.8 million before taxes and the taxable yield from 5.8% to 1.5%. This is tangible evidence of the profit opportunities from efficient cash management. . . .

"In summary, the policies governing banking relations and marketable security investments are intended to be sufficiently flexible to permit efficient cash management in a constantly changing economic environment. In adapting to these changes, the banking and investment division strives to fulfill its objectives of providing for the company's fiscal requirements at the lowest possible cost, and by so doing contributes to the profits of the company."

The foregoing drives us to the conclusion that, notwithstanding the activities described therein and which are involved in Item 7 were undertaken to manage surplus cash more profitably than, for example, by depositing it with financial institutions in interest bearing accounts, such activities do not represent a permanent commitment of a segregated or predetermined share of the capital of Westinghouse to an investment business or enterprise. The record fails to demonstrate, for example, that treasury bills were consistently held to maturity, or that a designated amount of capital was consistently maintained in the security market. Indeed, if the treasury bills or bonds were consistently held to maturity, they would be redeemed, or surrendered, not sold.

The *sales* of the readily marketable securities were, in the last analysis, actuated primarily by the immediate needs of Westinghouse from day to day throughout each year for cash to support its other business activities—and not primarily for the greatest profit obtainable in the securities market.

Therefore, to include gross receipts from such sales as "business done" would be to distort unreasonably the measure of the value of its Ohio business done compared to the value of its total business transacted, which is all that the business fraction is designed to reflect. See *Cooper-Jarrett* v. *Porterfield* (1968), 15 Ohio St. 2d 54; *Pullman Co.* v. *Evatt* (1944), 144 Ohio St. 295; and *Aluminum Co. of America* v. *Evatt* (1942), 140 Ohio St. 385.

Inasmuch as the statute does not limit the measure of "business done" to sales, a contrary conclusion might as reasonably lead to the inclusion as "business done" the gross dollar amount of such activities as centralized purchasing, personnel, accounting and research activities, not to mention the sale to finance companies of installment paper taken from customers, the investment of capital funds in the raw materials market or even the withdrawal of funds temporarily placed in interest-bearing accounts with financial institutions.

The decision of the Board of Tax Appeals being, in part, unreasonable, the cause is remanded to that board (*Penna. Rd. Co.* v. *Porterfield* [1970], 22 Ohio St. 2d 94), for assessment of the refund due Westinghouse in accordance with this opinion, that is, the totals represented by Items 1 through 5 shall be included in the "business done" fraction for the years involved and the totals represented by Items 6 and 7 for the same years shall be removed from the fraction.

*Decision reversed in part and affirmed in part.*

O'NEILL, C. J., HERBERT, DUNCAN and CORRIGAN, JJ., concur.[']
MATTHIAS, J., not participating.

---

['CHIEF JUSTICE TAFT participated in this case which was, however, decided after his death.