OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio.  Attention:  Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.  Your comments on this pilot project are also welcome.

NOTE:  Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public.  The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions.  The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

Diamond Financial Holdings, Inc., Appellee v. Limbach, Tax Commr., Appellant.
[Cite as Diamond Financial Holdings, Inc. v. Limbach (1993),        Ohio St.3d       .]
Taxation -- Franchise tax -- Amount of tax due on net worth
      basis determined, how -- Application of business-done
      factor in determining net worth base.
      (No. 92-1514 -- Submitted May 25, 1993 -- Decided September 8, 1993.)

Appeal from the Board of Tax Appeals, No. 88-J-1150.

The Tax Commissioner, appellant, contests the Board of Tax Appeals' ("BTA's") finding that Diamond Financial Holdings, Inc. ("Diamond"), appellee, was a quiescent holding company.  This finding removed one-half of Diamond's net worth from the franchise tax base.

Diamond, a wholly owned subsidiary of Dana Corporation, wholly owned the stock of several financial, insurance and leasing companies, some of which wholly owned other companies of these types.  For tax year 1984, Diamond received dividends from its subsidiaries, which Diamond passed on to Dana.  Diamond also received interest income from the subsidiaries, which paid for loans Diamond had obtained for the subsidiaries.  Diamond obtained the loans because it could combine the subsidiaries' balance sheets and apply greater leverage with the banks.  Diamond could also unify the subsidiaries' borrowing efforts.  Diamond passed the interest income, which represented Diamond's cost to borrow, onto the lenders.  Occasionally, Diamond also received reimbursements from subsidiaries for costs Diamond had paid.

Until March 31, 1983, nominal employees of Diamond operated the subsidiaries.  On April 1, 1983, Diamond transferred these employees and the property they used from its books to the subsidiaries' books.  However, the property remained in place, and the employees reported to the same location as before and performed the same work.

For tax year 1984, Diamond, since it had no net income, paid the franchise tax on the net worth basis.  Claiming to be a quiescent holding company under Nationwide Corp. v. Schneider

(1966), 7 Ohio St. 2d 59, 36 O.O. 2d 48, 218 N.E. 2d 611, it had applied its property factor to one-half of its net worth, with which it calculated its tax base, but did not calculate or apply a business-done factor to the other one-half of its net worth to add a business-done amount to the tax base.

The commissioner audited Diamond's return. She calculated a business-done factor, applied this factor to the unincluded one-half of Diamond's net worth, and added the result to the tax base. This action produced greater tax liability.

Diamond appealed to the BTA, and the BTA reversed the commissioner's order. The BTA found that Diamond did not engage in any independent business activity for itself as of January 1, 1984 and that, consequently, Diamond was not "doing business" on January 1, 1984.

The cause is now before this court upon an appeal as of right.

Jones, Day, Reavis & Pogue and Roger F. Day, for appellee.

Lee I. Fisher, Attorney General, Richard C. Farrin and Steven L. Zisser, Assistant Attorneys General, for appellant.

Per Curiam. Under R.C. 5733.01(A), the franchise tax is charged against a domestic corporation organized for profit "for the privilege of exercising its franchise during the calendar year in which such amount is payable," and against a foreign corporation "for the privilege of doing business in this state, owning or using a part or all of its capital or property in this state, or holding a certificate of compliance with the laws of this state authorizing it to do business in this state during the calendar year in which such amount is payable." According to R.C. 5733.01(B):

"A corporation is subject to the tax imposed by this chapter for each calendar year that it is so organized, doing business, owning or using a part or all of its capital or property, or holding a certificate of compliance on the first day of January of that calendar year."

R.C. 5733.04(F) defines "tax year" as "the calendar year in and for which the tax provided by this chapter is required to be paid." R.C. 5733.04(E) defines "taxable year" as:

"[T]he year or portion thereof upon the net income of which the value of the taxpayer's issued and outstanding shares of stock is determined or the year at the end of which the total value of the corporation is determined."

R.C. 5733.05 directs the determination of the value of a corporation's issued and outstanding stock. Under division (A), the net worth basis, the commissioner, after ascertaining the net worth of the corporation, determines the base on which the tax is computed under R.C. 5733.06 as follows:

"[D]ivide into two equal parts the value as determined in division (A) of this section of the issued and outstanding shares of stock of each corporation filing such report. Take one part and multiply it by a fraction whose numerator is the net book value of all the corporation's property owned or used by it in this state, and whose denominator is the net book value of all its property wherever situated * * *. Take the other part and multiply it by a fraction whose numerator is the value of the business done, measured by sales of tangible

personal property, by the corporation in this state during the year preceding the date of the commencement of its current annual accounting period, and whose denominator is the total value of its business, measured by sales of tangible personal property, during said year wherever transacted.

"* * *

"In the case of corporations whose business does not consist of the making of sales of tangible personal property and to which the sales numerator and denominator cannot apply, but which business consists of such activities as receiving commissions, rents, interests, dividends or distributions, and fees, the fraction shall be determined by allocating such business activities in and out of this state according to their situs." (Emphasis added.)

The commissioner then applies the rates specified in R.C. 5733.06 to the tax base to charge the tax. The commissioner collects the higher amount calculated on the net worth or net income basis.

In Proposition of Law Nos. One and Two, the commissioner argues that whether a corporation was "doing business" for the "business-done" factor of R.C. 5733.05(A) for a tax year must be based on the corporation's activities during the year preceding the tax year, its taxable year. Furthermore, the commissioner maintains that Diamond was doing business for tax year 1984 because its employees managed the affairs of the subsidiaries until March 31, 1983 of the taxable year preceding tax year 1984.

Diamond responds that whether a corporation is a quiescent holding company may be determined by its corporate structure and activities as they existed both prior to and after January 1 of the tax year for which it claims that status. It also argues that the BTA's factual determination that Diamond was a quiescent holding company for tax year 1984 is irreversible since it is supported by probative evidence.

The BTA and the parties have lost sight of what is taxed by focusing simply on whether and when Diamond did business. The tax is not on doing business; the tax is levied on holding a corporate franchise which enables the corporation to do business in a corporate form. In Cliffs Corp. v. Evatt (1941), 138 Ohio St. 336, 347, 20 O.O. 442, 447, 35 N.E. 2d 144, 149-150, we explained this concept:

"The contention that appellant is liable for the minimum fee only is grounded upon the theory that the liability for the franchise tax is based upon the doing of business. Consequently, since no business was done, appellant claims, the minimum only is chargeable. This position is too narrow. The tax imposed on a domestic corporation for profit is charged for the privilege of exercising its franchise. If the appellant was not doing business the fraction in the part of the formula expressing the ratio between business done inside and outside the state would be zero over zero. * * * On the other hand, if business was done during the year (it being conceded that there was no business done outside Ohio in any event), the fraction in the second part of the formula would be 1 over 1 * * *.

"The amount of the franchise tax turns, then, on whether business was done by the appellant 'during the year preceding the date of the commencement of its current annual accounting

period,' that is, during the year 1938 [for tax year 1939]."
See, also, Woodland Gardens Apts., Inc. v. Porterfield (1968),
16 Ohio St.2d 56, 57, 45 O.O. 2d 332, 333, 242 N.E. 2d 580, 581.

Accordingly, the corporation owes a franchise tax for the
privilege of exercising its corporate franchise to do business
in the ensuing tax year, whether it in fact does business in
the ensuing year.  This latter fact, of course, is not known on
January 1 of the tax year.  The amount of tax due, on the net
worth basis, is measured by applying a property factor to
one-half of a corporation's net worth and a business-done
factor to the other one-half.  The business-done fraction is
the ratio of business done in Ohio to business done everywhere,
in the year preceding commencement of the current annual
accounting period.  R.C. 5733.05.  (Diamond's annual accounting
period coincides with the calendar year.)  If a corporation did
no business in this preceding year, it has no business-done
factor to apply to one-half of its net worth.

According to Nationwide Corp. v. Schneider, supra, 7 Ohio
St. 2d at 61, 36 O.O. 2d at 50, 218 N.E. 2d at 613, a
corporation is not doing business if it does not have "'some
active participation for profit in a business activity,'"
quoting Std. Carloading Corp. v. Glander (1949), 152 Ohio St.
404, 410, 40 O.O. 403, 405, 89 N.E. 2d 575, 577.  The
Nationwide court extracted from Cliffs Corp. v. Evatt, supra,
the rule "that a holding company which is no more than an
intermediary or instrumentality for its shareholders and acts
only as a conduit in the receipt and distribution of dividends
for shareholders is not engaged in the doing of business."
Id., 7 Ohio St.2d at 60, 36 O.O. 2d at 49, 218 N.E. 2d at 613.
Moreover, "[w]hether a corporation is 'doing business' within
the meaning of Section 5733.05, Revised Code, depends upon the
facts in each case."  Id. at 64, 36 O.O. 2d at 51, 218 N.E. 2d
at 615.

In this case, the employees who managed the subsidiary
corporations until March 31, 1983 were Diamond's employees in
name only.  The subsidiaries were embryonic and needed few
employees to operate them.  Diamond accounted for, and filed
reports on, them to administer the various companies and their
payrolls economically.  In fact, on the April 1, 1983 transfer
date, business operations continued without anyone missing a
beat.  Thus, Diamond transacted no business itself in the
preceding year and need not include a business-done calculation
in its net worth base.  Accordingly, we affirm the BTA's
decision.

Next, in Proposition of Law No. Three, the commissioner
argues that the legislature has overruled the quiescent holding
company decisions in amending R.C. 5733.05.  Diamond denies
that the amendments affected these decisions.

Former G.C. 5498 (now R.C. 5733.05) read as follows:

"* * * [T]ake the other part and multiply by a fraction
whose numerator is the value of the business done by the
corporation in this state during the year preceding the date of
the commencement of its current annual accounting period and
whose nominator is the total value of its business during said
year wherever transacted."  113 Ohio Laws 636, 638.

Commissioner's Rule No. 276, promulgated in 1939, see
Westinghouse Elec. Corp. v. Porterfield (1970), 23 Ohio St.2d

50, 51-52, 52 O.O.2d 173-174, 261 N.E.2d 272, 273-274, stated:

"Corporations, whose business does not consist in the making of sales and to which Rule 275 cannot apply [sales of tangible personal property] but which business consists in such activities as receiving commissions, rents, interest, dividends, fees, etc., shall be determined by allocating such business activities in and out of Ohio according to their situs."

Effective December 1, 1967, the General Assembly enacted Am. Sub. S.B. No. 350, 132 Ohio Laws 1975-1976, which amended R.C. 5733.05 to read:

"* * * [T]ake the other part and multiply by a fraction whose numerator is the value of the business done, measured by sales of tangible personal property, by the corporation in this state during the year preceding the date of the commencement of its current annual accounting period, and whose denominator is the total value of its business, measured by sales of tangible personal property, during said year wherever transacted.

"To the extent that the value of business done in this state is measured by sales of tangible personal property, it shall, for the purpose of this section and of section 5733.03 of the Revised Code, mean sales where such property is received in this state by the purchaser. In the case of delivery of tangible personal property by common carrier or by other means of transportation, the place at which such property is ultimately received after all transportation has been completed shall be considered as the place at which such property is received by the purchaser. Direct delivery in this state, other than for purposes of transportation, to a person or firm designated by a purchaser constitutes delivery to the purchaser in this state and direct delivery outside the state to a person or firm designated by a purchaser does not constitute delivery to the purchaser in this state, regardless of where title passes or other conditions of sale.

"Corporations, whose business does not consist in the making of sales of tangible personal property and to which the sales numerator and denominator cannot apply but which business consists in such activities as receiving commissions, rents, interests, dividends, and fees shall be determined by allocating such business activities in and out of Ohio according to their situs." (Italicized material was new.)

The amendment sets forth rules on determining where sales occurred and codifies the commissioner's business-done rule. This rule existed when we announced the quiescent holding company decisions and is law if it agrees with relevant statutes and is reasonable. Ohio Academy of Nursing Homes, Inc. v. Barry (1990), 56 Ohio St.3d 120, 127, 564 N.E. 2d 686, 693. Thus, the amendments do not affect the quiescent holding company decisions.

Accordingly, we affirm the decision of the BTA.

Decision affirmed.

Moyer, C.J., A.W. Sweeney, F. E. Sweeney and Pfeifer, JJ., concur.

Wright, J., dissents.

Resnick, J., not participating.

Wright, J., dissenting. I agree with the majority that a corporation owes a franchise tax for the privilege of exercising

its corporate franchise to transact business in an ensuing tax year.  I also agree with the majority that a quiescent holding company need not apply a business-done fraction to one-half of its net worth if it did not actively participate for profit in a business activity in the preceding taxable year.  However, I strongly disagree with the majority that Diamond Financial Holdings, Inc. did not transact any business in the 1983 taxable year, and, thus, conclude that it must pay a tax calculated on this business done for the 1984 tax year.

In Std. Carloading Corp. v. Glander (1949), 152 Ohio St. 404, 40 O.O. 403, 89 N.E. 2d 575, syllabus, we held:

"An Ohio corporation whose sole activity is the holding of substantially all the shares of another corporation, the collection of dividends thereof and their distribution to the former's shareholders, is not doing business in this state within the meaning of the provisions of Section 5498, General Code [now R.C. 5733.05], even though the former corporation purchases additional shares of such other corporation and receives dividends from and executes proxies for the voting of shares, where the former corporation does not actively intervene or otherwise engage in the management of the subsidiary corporation either during the period involved or at any time prior thereto. (Cliffs Corp. v. Evatt, Tax Commr. [1941], 138 Ohio St. 336, [20 O.O. 442, 35 N.E.2d 144], distinguished.)"

In Nationwide Corp. v. Schneider (1966), 7 Ohio St.2d 59, 36 O.O. 2d 48, 318 N.E. 2d 611, paragraph two of the syllabus, we held:

"If there is no active participation by a holding company in the management of its subsidiary companies, the fact that the holding company engages in casual sales and acquisitions of stock and sales of its interests in other companies does not constitute 'doing business,' within the meaning of Section 5733.05, Revised Code, if such transactions, viewed in the light of such holding company's history, appear to be isolated and are not consummated specifically for purposes of profit making."

Thus, and conversely, if the holding company actively participates in the management of the subsidiaries in the taxable year, it is transacting business on which it must calculate the franchise tax for the ensuing tax year.

On cross-examination, counsel for the commissioner and the individual who was Diamond's president during the disputed taxable year engaged in the following colloquy:

"Q. You had indicated that the business purpose of Diamond Financial Holdings was simply to serve as a holding company for all the financial services companies, I guess the corporate umbrella of Dana Corporation.

"A. For the financial service group, yeah.

"Q. But initially at least through the first part of 1983 and, in fact, it also was actively engaged, to some extent, in the management of those financial service companies, was it not?

"A. Actually, I don't believe it was.

"Q. Well, you said a lot of them didn't have any employees.

"A. The employees were employed in Diamond in name only. They spent their time doing business for the accounts of Potomac Leasing and Shannon Properties and some of the other subsidiaries.

"Q. But they were employees of Diamond Financial Holdings, Inc.?

"A. Yes.  But there was nothing to do for Diamond, so they were doing it on behalf of the other companies.

"Q. But they were 100 percent owned subsidiaries of Diamond Financial Holdings, Inc.?

"A. That's true.

"Q. And employees of Diamond Financial Holdings, Inc., were the only employees in many regards who exercised any management over these subsidiaries?

"A. That's true.

"Q. So any business decisions had to have necessarily been made by Diamond Financial Holding Company employees?

"A. Prior to March 31st of 1983.

"Q. And those employees would obviously be controlled by the officers and/or directors of Diamond Financial Holdings, Inc.?

"A. Or other employees.

"Q. Or other employees of - -

"A. Diamond Financial Holdings - -

"Q. Diamond Financial?

"A. - - Inc."

Based on this testimony, and despite Diamond's protestations that these employees were its employees in name only, I can only conclude that Diamond actively intervened and engaged in the management of the subsidiary corporations during a portion of the taxable year.  Diamond's employees managed the subsidiaries and made the business decisions of the subsidiaries until March 31, 1983, in the taxable year on which the tax base for tax year 1984 is calculated.  I might agree with the majority if tax year 1985 were involved and Diamond continued to operate in taxable year 1984 as it operated after March 31, 1983.  However, I would reverse the BTA's decision as to the tax year before us, 1984.

Thus, I must respectfully dissent.