**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Cleveland Metro. Bar Assn. v. Morton*, **Slip Opinion No. 2021-Ohio-4095.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-4095

CLEVELAND METROPOLITAN BAR ASSOCIATION *v*. MORTON.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Cleveland Metro. Bar Assn. v. Morton*, Slip Opinion No. 2021-Ohio-4095.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including engaging in undignified or discourteous conduct that is degrading to a tribunal, making a statement that a lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualification or integrity of a judicial officer, and engaging in conduct that is prejudicial to the administration of justice—One-year suspension with six months stayed on condition of no further misconduct.*

(No. 2020-1520—Submitted May 12, 2021—Decided November 23, 2021.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2020-021.

_____

**Per Curiam.**

{¶ 1} Respondent, John Alex Morton, of Richmond Heights, Ohio, Attorney Registration No. 0028021, was admitted to the practice of law in Ohio in 1975.

{¶ 2} In an April 2020 complaint, relator, Cleveland Metropolitan Bar Association, alleged that Morton committed four ethical violations by making improper statements that impugned the integrity of judicial officers in a document filed in this court. Morton denied the charges and moved for dismissal of the complaint and then for summary judgment, but both motions were overruled. The matter proceeded to a hearing before a three-member panel of the Board of Professional Conduct. Based on the evidence presented at the hearing, the panel dismissed one alleged rule violation and found that Morton had committed three others. The panel recommended that Morton be suspended from the practice of law for one year with the entire suspension stayed on the condition that he commit no further misconduct. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. Morton objects to the board's findings of misconduct and argues that the complaint should be dismissed. Relator objects to the recommended sanction and urges us to suspend Morton from the practice of law for six months with no stay.

{¶ 3} For the reasons that follow, we overrule Morton's objections and adopt the board's findings of misconduct. We also sustain relator's objection in part and suspend Morton from the practice of law for one year with six months stayed on the condition that he commit no further misconduct.

## Misconduct

*The Board's Findings of Fact and Misconduct*

{¶ 4} The conduct at issue in this case arises from Morton's representation of Fred P. Schwartz in his attempts to reduce the tax valuation of a parcel of real property in Cuyahoga County.

{¶ 5} Although Schwartz purchased the property for $5,000 in 2011, a Cuyahoga County fiscal officer valued it at $126,800 for the 2011 tax year. After the Cuyahoga County Board of Revision ("BOR") and the Board of Tax Appeals ("BTA") affirmed the county's valuation, Morton filed an appeal in this court. We reversed and remanded the case with instructions that the $5,000 sale price be used as the property's value for the 2011 tax year. *Schwartz v. Cuyahoga Cty. Bd. of Revision*, 143 Ohio St.3d 496, 2015-Ohio-3431, 39 N.E.3d 1223, ¶ 31-32 ("*Schwartz I*"). Schwartz and the county then agreed that the property would be valued at $12,500 for the next three years.

{¶ 6} In 2015, the county fiscal officer valued the property at $107,900, and Morton filed a complaint with the BOR seeking a valuation of $5,000. Morton asked the BOR to order the systems administrator for the county fiscal office to appear and testify about the methodology that the county used to determine the property's value. Without taking evidence from the systems administrator, the BOR found that the 2011 sale price was too remote in time and retained the fiscal officer's valuation.

{¶ 7} Morton appealed the BTA's decision to the Eighth District Court of Appeals. *See Schwartz v. Cuyahoga Cty. Bd. of Revision*, 8th Dist. Cuyahoga No. 106659, 2018-Ohio-4712, ¶ 4-5 ("*Schwartz II*"). There, he asserted that the BOR had improperly assigned the burden of proof to Schwartz and argued that because he had submitted evidence that the property was sold for $5,000 in 2011, the burden shifted to the BOR to present evidence to support the county's valuation. *Id.* at ¶ 26. The court of appeals noted, however, that in *Moskowitz v. Cuyahoga Cty. Bd. of Revision*, 150 Ohio St.3d 69, 2017-Ohio-4002, 78 N.E.3d 870, ¶ 9-10, this court had held that the caselaw "unequivocally refutes" that burden-shifting argument.[1] *Schwartz II* at ¶ 27. In *Moskowitz*, we reiterated our past holdings that the appellant

---

1. Morton was familiar with the decision because he had represented Moskowitz. *Schwartz II* at ¶ 28.

bears the burden of demonstrating that the value it advocates is correct and that if the appellant fails to carry that burden, the BTA may approve the taxing authority's assessment. *Id.* at ¶ 9, citing *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 6, and *Westlake Med. Investors, L.P. v. Cuyahoga Cty. Bd. of Revision*, 74 Ohio St.3d 547, 549, 660 N.E.2d 467 (1996). Because the county's fiscal officer was presumed to carry out his statutorily prescribed duties in good faith absent a showing to the contrary and Schwartz did not challenge the BTA's finding that he had failed to present any evidence of the property's 2015 value, the court of appeals held that the BTA's decision was reasonable and lawful. *Schwartz II* at ¶ 22-23, 32.

{¶ 8} Morton sought this court's discretionary review of the Eighth District's decision. In a January 2019 memorandum in support of jurisdiction filed in this court, Morton argued that *Moskowitz* was wrongly decided. He claimed that in *Moskowitz*, this court adopted "its own unique standard for the burden of proof in [real-property tax cases]" but that "it should have supported this assertion with some solid case-law." And "[b]ecause the *Moskowitz* Court could not do so, instead it intentionally misstated the holding of each of the cases it cited, none of which actually discussed the two parts of the burden of proof in valuation cases, i.e., the burden of production of evidence and the burden of persuasion." Morton also criticized the court of appeals for accusing him of "being disingenuous in his critical view of the BTA's citation of [*Fairlawn Assocs., Ltd. v. Summit Cty. Bd. of Revision*, 9th Dist. Summit No. 22238, 2005-Ohio-1951]," and he stated that "[a]part from the BTA's and court of appeals' fabrication of the Fairlawn decision"—purportedly to shield an assessing authority from any review of its appraisal methods—"it defies common sense to conclude that the government assessing authorities are not required to defend their initial determinations of

value."[2] He then opined, "Only politicians committed to maximizing the revenue of their political cronies could reach such a conclusion, and cite the *Fairlawn* decision as the authority for same."

{¶ 9} The overarching theme of Morton's memorandum in support of jurisdiction was that in *Moskowitz*, this court distorted its past holdings to achieve its own political agenda. According to Morton, the *Moskowitz* decision "was based upon politics, not law," and "[t]he political goal of the *Moskowitz* Court was to maximize government revenue, at the expense of the taxpayer, and his or her Constitutional right to limited taxation." After suggesting that Justice French had "persistently and incorrectly maintained that this Court should defer to the government" in property-valuation matters, Morton claimed that "Justices French and Kennedy * * * showed a willingness to favor the government, at the expense of the taxpayer and the Constitution, no matter how unreasonable the government's view of the true value of subject property." "Also on the political agenda," Morton claimed, "was the promotion of the leadership of Justice French on this Court."

{¶ 10} In support of those claims, Morton stated, "The most obvious evidence of the political nature of the *Moskowitz* decision was the decision to delay the decision until Justices Pfeifer and Lanzinger retired from the Court, and were replaced by Justices Fischer and DeWine." Moreover, he proclaimed, "[r]esponsibility for the delay must be assigned to Chief Justice O'Connor, since it would not have been tolerated without her approval." On March 20, 2019, this

---

2. The court of appeals had found that the BTA cited *Fairlawn* for the proposition that " 'the burden is placed upon the complainant, in this case the property owner, to bring forth sufficient evidence that the value is something other than that which was initially assessed.' " *Schwartz II* at ¶ 31, quoting the BTA decision. In contrast to Schwartz, the property owner in *Fairlawn* prevailed because it had presented competent probative evidence in the form of an expert appraisal report showing that the value of the property was less than the county's assessed value and the board had failed to rebut that evidence. *Fairlawn* at ¶ 15.

court declined to accept jurisdiction over Schwartz's appeal. *Schwartz v. Cuyahoga Cty. Bd. of Revision*, 155 Ohio St.3d 1406, 2019-Ohio-944, 119 N.E.3d 434.

{¶ 11} Based on these statements, the board found that in a pleading before this court, Morton had "voiced undignified and discourteous statements about judges and justices who did nothing more than rule contrary to his client's position." Based on Morton's testimony that he made no investigation into these matters and relied on the inferences he had drawn from the facts and the law, the board found that he had "made no real inquiry into the judges' and justices' integrity prior to making these statements." Citing *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425—which adopted an objective standard to determine whether a lawyer's statements about a judicial officer were made with knowledge or reckless disregard of their falsity—the board found that Morton had no reasonable factual basis for his allegations.

{¶ 12} Ultimately, the board concluded that instead of engaging in legitimate commentary regarding the merits of the courts' decisions, Morton had attacked the judicial process and thereby violated Prof.Cond.R. 3.5(a)(6) (prohibiting a lawyer from engaging in undignified or discourteous conduct that is degrading to a tribunal), 8.2(a) (prohibiting a lawyer from making a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judicial officer), and 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice).

*Morton's Objections*

{¶ 13} Morton raises four objections to the board's findings of misconduct.

{¶ 14} First, Morton objects to the board's denial of his motions to dismiss the complaint against him, alleging that relator did not have standing to bring this case against him because there was no grievant. He cites *Ohioans for Concealed Carry, Inc. v. Columbus*, 164 Ohio St.3d 291, 2020-Ohio-6724, 172 N.E. 935, for

the proposition that a plaintiff must allege a personal stake in the outcome of the controversy that would entitle the plaintiff to have a court hear his case. But that requirement has no application in the context of an attorney-discipline proceeding.

{¶ 15} Article IV, Section 2(B)(1)(g) of the Ohio Constitution grants this court original jurisdiction over the admission to the practice of law, the discipline of persons so admitted, and all other matters relating to the practice of law. Pursuant to that jurisdiction, we have promulgated the Rules for the Government of the Bar, including Gov.Bar R. V(12), which sets forth the procedures governing attorney-discipline proceedings. "A disciplinary proceeding is instituted to safeguard the courts and to protect the public from the misconduct of those who are licensed to practice law, and is neither a criminal nor a civil proceeding." *In re Judicial Campaign Complaint Against Carr*, 76 Ohio St.3d 320, 322, 667 N.E.2d 956 (1996).

{¶ 16} In addition to authorizing the Office of Disciplinary Counsel or a certified grievance committee to investigate grievances, Gov.Bar R. V(9)(C)(1) provides that either of those entities "shall review and may investigate any matter filed with it or that comes to its attention and may file a complaint pursuant to this rule in cases where it finds probable cause to believe that misconduct has occurred." Citing that rule, we have rejected an attorney's claim that disciplinary counsel lacked investigative authority over an issue merely because it was not first raised in a written grievance. *See Disciplinary Counsel v. Oviatt*, 155 Ohio St.3d 586, 2018-Ohio-5091, 122 N.E.3d 1246, ¶ 22. Because Gov.Bar R. V(9)(C)(1) also expressly authorizes disciplinary counsel or a certified grievance committee to file a complaint following such an investigation when they find probable cause to believe that misconduct has occurred, we find that Morton's first objection is without merit.

{¶ 17} In his second and third objections, Morton challenges the board's reliance on *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048,

793 N.E.2d 425, and asserts that his statements constitute constitutionally protected free speech. Specifically, Morton alleges that the legal underpinnings of *Gardner* are unsound and that the objective test adopted in that case impermissibly punishes false speech that is negligently made.

{¶ 18} In *Gardner*, we stated, "The United States Supreme Court has held that '[i]t is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to "free speech" an attorney has is extremely circumscribed,' " and that " '[e]ven outside the courtroom, a majority of the Court in two separate opinions in the case of *In re Sawyer*, 360 U.S. 622, [79 S.Ct. 1376, 3 L.Ed.2d 1473] (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be.' " (Second set of brackets added.) *Gardner* at ¶ 14, quoting *Gentile v. Nevada State Bar*, 501 U.S. 1030, 1071, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). Relying on *Gentile*, we found that "[a]n attorney's speech may be sanctioned if it is highly likely to obstruct or prejudice the administration of justice," *id.,* citing *Gentile* at 1075, and that those narrow restrictions "are justified by the integral role that attorneys play in the judicial system," *id.*, citing *Gentile* at 1074.

{¶ 19} We adopted " 'an objective standard to determine whether a lawyer's statement about a judicial officer is made with knowledge or reckless disregard of its falsity.' " *Gardner* at ¶ 26, quoting American Bar Association, *Annotated Model Rules of Professional Conduct*, Rule 8, at 566 (4th Ed.1999). That standard looks to " ' "what the reasonable attorney, considered in light of all his professional functions, would do in the same or similar circumstances" * * * [and] focuses on whether the attorney had a reasonable factual basis for making the statements, considering their nature and the context in which they were made.' " (Brackets and ellipses added in *Yagman*.) *Id.*, quoting *Standing Commt. on Discipline of United States Dist. Court for Cent. Dist. of California v. Yagman*, 55

F.3d 1430, 1437 (9th Cir.1995), quoting *United States Dist. Court for E. Dist. of Washington v. Sandlin*, 12 F.3d 861, 867 (9th Cir.1993).

{¶ 20} Morton contends that the concept that an attorney's freedom of speech is "extremely circumscribed" in the context of a judicial proceeding predates the United States Supreme Court's decisions in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), and that those decisions "substantially broadened an attorney's rights to free speech when criticizing public officials." *Sullivan* permitted public officials to recover civil damages for defamatory falsehoods regarding their official conduct that are made with "actual malice," which the court defined as acting "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Id.* at 270. And the court in *Garrison* held that proof of actual malice is necessary to establish criminal liability for defamation of a public official. *Id.* at 79. But neither of those cases purported to apply that standard to disciplinary proceedings arising from an attorney's in-court speech. And contrary to Morton's argument, both of those cases predate the "extremely circumscribed" language of *Gentile* by nearly 30 years.

{¶ 21} In *Gardner*, we explained:

"Defamation actions seek to remedy an essentially private wrong by compensating individuals for harm caused to their reputation and standing in the community. Ethical rules that prohibit false statements impugning the integrity of judges, by contrast, are not designed to shield judges from unpleasant or offensive criticism, but to preserve public confidence in the fairness and impartiality of our system of justice."

\* \* \*

> * * * [T]he state's compelling interest in preserving public confidence in the judiciary supports applying a standard in disciplinary proceedings different from that applicable in defamation cases. Under the objective standard, an attorney may still freely exercise free speech rights and make statements supported by a reasonable factual basis, even if the attorney turns out to be mistaken.

99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, ¶ 29-31, quoting *Yagman* at 1437.

{¶ 22} We recently applied *Gardner*'s objective test to judicial-campaign speech in *In re Judicial Campaign Complaint Against Falter*, 164 Ohio St.3d 457, 2021-Ohio-1705, 173 N.E.3d 484. There, we found that "Ohio's interest in preserving public confidence in the integrity of its judiciary supports applying a standard in judicial-candidate-discipline proceedings different from that applicable in defamation cases." *Id*. at ¶ 16. Moreover, we found that because Jud.Cond.R. 4.3(A) requires a judicial candidate to act with a specific mental state, i.e., knowing the information to be false or with a reckless disregard of whether it was false, "[n]egligently made false statements or negligent misstatements are not prohibited by the rule." *Id*. at ¶ 18.

{¶ 23} An attorney acts knowingly if he or she has "actual knowledge of the fact in question." Prof.Cond.R. 1.0(g). And like a judicial candidate, an attorney acts recklessly if a certain result is possible and the attorney chooses to ignore the risk. *See Falter* at ¶ 18, citing *In re Judicial Campaign Complaint Against Moll*, 135 Ohio St.3d 156, 2012-Ohio-5674, 985 N.E.2d 436, ¶ 11. Here, contrary to Morton's arguments, it was not only possible—but true—that our decision in *Moskowitz* was based on well-settled law. There were a record-high number of tax appeals filed in this court in 2014 and 2015. But Morton chose to ignore the

possibility that any delay in reaching a decision in the *Schwartz* appeal was attributable to the high number of cases and acted with reckless disregard by attributing political motives to our decision and what he perceived as delay in reaching it. He admitted that he made *no* investigation and relied solely upon his own interpretation of the facts in making his statements. These facts establish that Morton acted with reckless disregard for the truth of his accusations. Based upon the foregoing, we overrule Morton's second and third objections.

{¶ 24} In his fourth objection, Morton contends that the board erred in finding that his statements violated Prof.Cond.R. 3.5(a)(6) and 8.4(d) for two reasons. We have already rejected Morton's argument that his statements were protected speech. His final argument is that the board failed to cite sufficient caselaw to support its findings of misconduct. But we have routinely found that attorneys have violated Prof.Cond.R. 3.5(a)(6) by making undignified or discourteous statements degrading to a tribunal in documents that have been filed in a court. *See, e.g.*, *Toledo Bar Assn. v. Yoder*, 162 Ohio St.3d 140, 2020-Ohio-4775, 164 N.E.3d 405 (statements were made in an affidavit of bias and prejudice); *Disciplinary Counsel v. Proctor*, 131 Ohio St.3d 215, 2012-Ohio-684, 963 N.E.3d 806 (statements were made in a supplement to a trial-court motion and reiterated in an appellate brief); *Disciplinary Counsel v. Pullins*, 127 Ohio St.3d 436, 2010-Ohio-6241, 940 N.E.2d 952 (statements were made in an affidavit of disqualification). And we have found on multiple occasions that unfounded attacks on the judiciary in publicly filed documents are prejudicial to the administration of justice. *See, e.g.*, *Disciplinary Counsel v. Frost*, 122 Ohio St.3d 219, 2009-Ohio-2870, 909 N.E.2d 1271, ¶ 5, 18 (an attorney engaged in conduct that was prejudicial to the administration of justice by falsely accusing several common-pleas-court judges of bias in the execution of their duties and by leveling unfounded accusations of racial bias and other impropriety against a federal judge); *Disciplinary Counsel v. Stafford*, 131 Ohio St.3d 385, 2012-Ohio-909, 965 N.E.2d 971, ¶ 57-58 (an

attorney violated Prof.Cond.R. 8.4(d) by making false statements regarding the integrity of the judge that intentionally, unnecessarily, and recklessly demeaned the judge in a memorandum in support of a motion that was in the public record); *Disciplinary Counsel v. Gallo*, 131 Ohio St.3d 309, 2012-Ohio-758, 964 N.E.2d 1024, ¶ 6-7, 11 (an attorney violated Prof.Cond.R. 8.4(d) by recklessly failing to independently verify the identity of a man he had observed at the courthouse before alleging in a publicly filed affidavit that it was a judge attempting to intimidate his client). We therefore overrule Morton's fourth and final objection to the board's findings of misconduct.

{¶ 25} Having overruled each of Morton's objections, we adopt the board's findings of misconduct.

**Sanction**

{¶ 26} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

*Aggravating and Mitigating Factors*

{¶ 27} As aggravating factors, the board found that Morton refused to acknowledge the wrongful nature of his conduct, made no effort to verify the truthfulness of the statements set forth in his jurisdictional memorandum, and denied that his comments were undignified or discourteous. *See* Gov.Bar R. V(13)(B)(7). He testified that he planned to engage in the same type of conduct in the future—even though he acknowledged that a lawyer could argue that a court did not follow the law without accusing the court of misconduct. Morton also was indignant and confrontational throughout the course of the hearing, refused to abide by the rulings of the panel chair, and repeatedly directed improper questions to the panel members. *See* Gov.Bar R. V(13)(B)(5).

{¶ 28} In mitigation, the board found that Morton had no prior discipline and lacked a dishonest or selfish motive. *See* Gov.Bar R. V(13)(C)(1) and (2). He offered no evidence of his character or reputation.

*Recommended Sanction and Relator's Objection*

{¶ 29} Having denied any wrongdoing, Morton did not address the issue of a sanction at the hearing or in his posthearing brief. On the other hand, relator argued that consistent with our holdings in *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, and *Proctor*, 131 Ohio St.3d 215, 2012-Ohio-684, 963 N.E.2d 806, Morton's misconduct warranted a six-month suspension from the practice of law.

{¶ 30} The board acknowledged that our decisions in *Gardner* and *Proctor* supported relator's proposed sanction. Nonetheless, citing *Disciplinary Counsel v. Shimko*, 134 Ohio St.3d 544, 2012-Ohio-5694, 983 N.E.2d 1300, the board recommended that we suspend Morton from the practice of law for one year, stayed in its entirety on the condition that he commit no further misconduct. Relator objects to the board's recommendation and renews its argument that the appropriate sanction for Morton's misconduct is a six-month actual suspension from the practice of law.

{¶ 31} We agree with relator's contention that the facts of this case are most comparable to those of *Gardner* and *Proctor*. The attorney in *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, filed a motion for reconsideration of an appellate-court decision in which he had improperly accused the appellate panel of harboring bias toward the prosecution, corrupting the law, and issuing a result-driven opinion in rendering a judgment adverse to his client. Gardner made no inquiry into the court's integrity before launching his attack, which Morton also failed to do, and we found no evidence of bias or corruption in the court of appeals' opinion. *Id.* at ¶ 33-34. We determined that Gardner's conduct violated rules that prohibited attorneys from engaging in undignified or discourteous conduct that is

degrading to a tribunal and knowingly making false accusations about a judge. *Id.* at ¶ 1, 35.

{¶ 32} Although Gardner had no prior discipline and acknowledged the need to challenge judicial decisions in an appropriate manner, he maintained that the appellate court "had skewed and ignored the facts, disregarded honesty and truth, and violated their oaths to decide cases fairly and impartially." *Id.* at ¶ 11. Holding that "[u]nfounded attacks against the integrity of the judiciary require an actual suspension from the practice of law," we rejected the board's recommendation that we impose a six-month conditionally stayed suspension and imposed a six-month suspension with no stay for Gardner's misconduct. *Id.* at ¶ 36.

{¶ 33} In *Proctor*, 131 Ohio St.3d 215, 2012-Ohio-684, 963 N.E.2d 806, we also imposed a six-month suspension on an attorney who had filed several documents accusing a trial judge of harboring bias against him and engaging in ex parte communications with opposing counsel and then going to great efforts to cover up the alleged conduct. Although Proctor had no disciplinary record and cooperated in the resulting disciplinary proceedings, he also engaged in a pattern of misconduct involving multiple offenses. Like Morton, he continued to claim that he had a reasonable belief to support his accusations, though Proctor actually had stipulated to the contrary. *Id.* at ¶ 10-11.

{¶ 34} The attorney in *Shimko*, 134 Ohio St.3d 544, 2012-Ohio-5694, 983 N.E.2d 1300, acted in a disrespectful and confrontational manner during a trial and then, over a period of nine months, filed multiple documents in which he accused the trial judge of being dishonest and having improper motives for his rulings. Shimko, like Morton, was unapologetic, failed to acknowledge the wrongful nature of his conduct, and maintained that he honestly believed his statements to be true. *Id.* at ¶ 24, 29. He also had prior discipline. However, he ultimately cooperated in the disciplinary process and acknowledged that attorneys do not have an unfettered

14

right to say whatever they desire about a member of the judiciary, and he established that he had an excellent reputation with the bench and bar. While recognizing that Shimko's statements about the trial judge were "rough, unnecessary, and ultimately unproductive," *id*. at ¶ 34, a majority of this court found that they were "less defamatory than Gardner's rant against three judges on the court of appeals," *id.,* and consequently imposed a conditionally stayed six-month suspension, *id.* at ¶ 36.

{¶ 35} In contrast to the attorney in *Shimko*, Morton was combative and obstreperous throughout his disciplinary hearing, was discourteous to the panel members, and often refused to accept the panel chair's evidentiary rulings. At the hearing, he accused relator's counsel, bar counsel, and members of the certified grievance committee of having conflicts of interest and acting with bias because they were allegedly appointed to serve on various committees convened by this court. And while Shimko's improper statements were directed at a single trial judge, Morton, like Gardner, criticized three appellate-court judges. In addition, he falsely and recklessly charged the entire Supreme Court of Ohio with intentionally delaying a case and misstating the law that it has been sworn to uphold for improper political motives. Furthermore, he did so in a document filed in this court that remains readily accessible to the public on this court's online docket. On these facts, we find that Morton's conduct is more egregious than that of the attorneys in *Shimko*, *Gardner*, and *Proctor*, and we agree with relator that Morton's unfounded attack against the judiciary warrants an actual suspension from the practice of law. We therefore sustain relator's objection in part and conclude that a one-year suspension with six months stayed on the condition that Morton commit no further misconduct is the appropriate sanction in this case.

## Conclusion

{¶ 36} Accordingly, John Alex Morton is suspended from the practice of law in Ohio for one year, with six months stayed on the condition that he commit

no further misconduct. If Morton fails to comply with the condition of the stay, the stay will be lifted and he will serve the entire one-year suspension. Costs are taxed to Morton.

Judgment accordingly.

FISCHER, DONNELLY, and BRUNNER, JJ., concur.

O'CONNOR, C.J., concurs, with an opinion joined by FISCHER, DONNELLY, and BRUNNER, JJ.

STEWART, J., concurs in part and dissents in part and would adopt the recommended sanction of the Board of Professional Conduct but otherwise joins the per curiam opinion and Chief Justice O'Connor's concurring opinion.

KENNEDY, J., dissents, with an opinion.

DEWINE, J., dissents, with an opinion.

_____

**O'CONNOR, C.J., concurring.**

{¶ 37} I fully concur with the majority's reasoning and in its judgment, which properly sanctions respondent, John Alex Morton, for his statements attacking the integrity of the judicial process. This case involves Morton's blatant breach of the professional duties, including preserving the integrity of the court, that he agreed to be bound by as an officer of the court and the consequences for failing to comply with those duties. As this court has unanimously done many times before, the majority properly applies the objective test set forth in *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, to the facts of this case. *See, e.g.*, *Erie-Huron Cty. Bar Assn. v. Bailey and Bailey*, 161 Ohio St.3d 146, 2020-Ohio-3701, 161 N.E.3d 590. I write separately to respond to the dissenting opinions' needless attempt to distract from this focus with First Amendment arguments and to paint members of this court as fragile and vindictive.

{¶ 38} It is well established that practicing law is a privilege, not a right. *See Shimko v. Lobe*, 103 Ohio St.3d 59, 2004-Ohio-4202, 813 N.E.2d 669, ¶ 54 ("no person has a right to practice law, but * * * the practice of law is an extraordinary privilege bestowed by this court upon one who meets the qualifications for admission and continues to maintain the standard of ethical conduct as prescribed by the rules of the court"). And accompanying the privilege of bar licensure are conditions. *See Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1066, 111 S.Ct. 2720, 115 L.E.2d 888 (1991), quoting *In re Rouss*, 221 N.Y. 81, 84, 116 N.E. 782 (1917) (" 'Membership in the bar is a privilege burdened with conditions' "). One such condition outlined in the Ohio Rules of Professional Conduct, among many others, is that "[a] lawyer should demonstrate respect for the legal system and for those who serve it." Prof.Cond.R., Preamble [5]. It is "a lawyer's duty to uphold [the] legal process." *Id*. In fact, this important condition is integrated into the very oath that Ohio attorneys take upon entering this privileged and regulated profession:

> I, _____, hereby (swear or affirm) that I will support the Constitution and the laws of the United States and the Constitution and the laws of Ohio, and I will abide by the Ohio Rules of Professional Conduct.
>
> In my capacity as an attorney and officer of the Court, I will conduct myself with dignity and civility and show respect towards judges, court staff, clients, fellow professionals, and all other persons.
>
> I will honestly, faithfully, and competently discharge the duties of an attorney at law.

Gov.Bar R. I(9)(A).

**{¶ 39}** By taking this oath, an attorney accepts several duties as an officer of the court. *See Shimko* at ¶ 41, citing *Anderson v. Elliot*, 555 A.2d 1042, 1048 (Me.1989). One such duty is "to abide by the Ohio Rules of Professional Conduct." Another is to act "with dignity and civility" and "show respect towards judges" and fellow professionals. An attorney willingly agrees to comply with these duties and, in doing so, accepts that there are professional consequences for failing to fulfill these duties. Consequently, although attorneys, like other citizens, enjoy the right to free speech, they also willingly accept the conditions that arise with the privilege to practice law. *See In re Sawyer*, 360 U.S. 622, 646, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959) (Stewart, J., concurring in the result) ("A lawyer belongs to a profession with inherited standards of propriety and honor * * *. He who would follow that calling must conform to those standards").

**{¶ 40}** As the majority opinion points out, professional rules and conditions that " 'prohibit false statements impugning the integrity of judges * * * are not designed to shield judges from unpleasant or offensive criticism, but to preserve public confidence in the fairness and impartiality of our system of justice.' " *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 29, quoting *Standing Commt. on Discipline of United States Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1437 (9th Cir.1995). Stated differently, the underpinning of these professional-conduct rules is the preservation of the integrity of the court by protecting the public from incompetent and unprofessional attorneys, *In re Holtzman*, 78 N.Y.2d 184, 192, 573 N.Y.S.2d 39, 577 N.E.2d 30 (1991), maintaining public trust in the judicial system's impartiality, *Gardner* at ¶ 29, and promoting the effective administration of justice, *id*. at ¶ 14, citing *Gentile* at 1074. These are far from hollow sentiments: the integrity of the court is an essential cog in the democratic system. *See In re ESM Govt. Securities, Inc.*, 66 B.R. 82, 84 (S.D.Fla.1986). As the preamble to the Ohio Rules of Professional Conduct duly notes, "legal institutions in a constitutional democracy depend on

18

popular participation and support to maintain their authority." Prof.Cond.R., Preamble at [6]. And lawyers, in furtherance of this democratic system, should foster "the public's understanding of and confidence in the rule of law and the justice system." *Id.*

{¶ 41} Morton, like all other Ohio attorneys, took an oath of office on entering the practice of law. By doing so, he accepted and agreed to be bound by the duty to adhere to the Ohio Rules of Professional Conduct, including the rule requiring an attorney to have a reasonable factual basis before making a statement, *see Gardner* at ¶ 26 (whether an attorney has a reasonable factual basis for making a statement is the standard for determining whether the attorney's statements about a judicial officer were made with knowledge or reckless disregard of their falsity). Thus, contrary to the second dissenting opinion's suggestions, this disciplinary action does not derive from a desire to prevent "future Mortons from leveling similar attacks on this court." Second dissenting opinion at ¶ 100. Nor was it brought because our skin is too "thin." *Id*. at ¶ 72. In fact, disciplining Morton has nothing to do with *this* court or any of its justices. Rather, it is about preserving the integrity of *the* court—i.e., the judicial system as a whole—by maintaining public confidence in the court's impartiality and the rule of law. *See Gardner* at ¶ 29.

{¶ 42} Morton's statements accusing this court of furthering its own political agenda directly undermines this confidence. Accusations made with reckless disregard for their truth lead the public to believe that the judiciary is not only partial but is politically motivated to rule on cases for selfish ends. Accordingly, the disciplinary action against Morton seeks to remedy this wrong against society. *See In re Terry*, 271 Ind. 499, 502, 394 N.E.2d 94 (1979) (professional misconduct "is not punished for the benefit of the affected person; the wrong is against society as a whole, the preservation of a fair, impartial judicial system, and the system of justice as it has evolved for generations").

**{¶ 43}** Several avenues are available to deal with a judge whose conduct runs afoul of his or her duties. If an attorney or party believes that a judge is biased, he or she may file an affidavit pursuant to R.C. 2701.03 to disqualify the judge. Or the Ohio State Bar Association may charge the judge with professional misconduct. *See generally* Rules of the Code of Judicial Conduct. I cite these examples to emphasize that Morton had several vehicles by which to express his criticisms that would have aligned with the professional duties he accepted; he chose none of these options, however. Rather, Morton decided to voice his criticisms through "groundless assertions" in filings to this court. *In re Cobb*, 445 Mass. 452, 473, 838 N.E.2d 1197 (2005) ("The court room is not a place for groundless assertions, whatever their nature"). Morton cannot now seek refuge under the First Amendment when he chose to ignore the professional duties that he willfully accepted when he took his oath as an attorney. *See Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 15 ("attorneys may not invoke the federal constitutional right of free speech to immunize themselves from even-handed discipline for proven unethical conduct").

**{¶ 44}** With this backdrop in mind, it is evident that the First Amendment arguments presented by the two dissenting opinions are nothing but a red herring. The dissenting opinions cite a litany of cases for the proposition that the majority's opinion "chill[s]," first dissenting opinion at ¶ 69, and "stifle[s]," second dissenting opinion at ¶ 102, attorneys' political speech, thus silencing voices that are integral to the public discussion of self-government. Indeed, it is true that attorneys, who are active participants in the judicial system, play an important role in exposing problems within that system. And thus their criticisms are an important voice in the public discourse that the First Amendment seeks to protect. *See State ex rel. Oklahoma Bar Assn. v. Porter*, 766 P.2d 958, 967 (Okla.1988).

**{¶ 45}** But the constitutional concerns designed to further robust public discussion in the press are not implicated here. Unlike several of the cases cited by

the dissenting opinions, Morton did not make his statements to any member of the press. *See, e.g., Yagman*, 55 F.3d at 1434; *Iowa Supreme Court Attorney Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 74 (Iowa 2008); *Garrison v. Louisiana*, 379 U.S. 64, 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Porter* at 960-961. Rather, Morton, using his privilege to practice law and to actively participate in the judicial system, and with reckless disregard for the truth of his statements, filed a pleading in which he accused this court of adjudicating based on political motives. In doing so, he undermined the integrity of the court and violated the very oath to which he willingly agreed to adhere so that he could practice as an attorney in Ohio.

{¶ 46} Preserving the integrity of the court depends on the public's confidence and respect for the judicial system and the long-standing disciplinary rules regulating attorneys' conduct in that system. *See In re Chmura*, 461 Mich. 517, 535, 608 N.W.2d 31 (2000) (to preserve the integrity of the legal process, people must have confidence in this process); *see generally In re Terry*, 271 Ind. at 502-504, 394 N.E.2d 94. Morton's unwarranted, in-court statements served only "to weaken the public's trust in the judicial system." *Bd. of Professional Responsibility v. Parrish*, 556 S.W.3d 153, 166 (Tenn.2018). Any distraction from that focus of the court's disciplinary sanction—such as creating a First Amendment smokescreen aimed at inflaming the public—further undermines the integrity of the court from the bench. For these reasons, I fully concur in the majority opinion.

FISCHER, DONNELLY, and BRUNNER, JJ., concur in the foregoing opinion.

STEWART, J., concurs in the foregoing opinion except that she would impose the sanction recommended by the Board of Professional Conduct.

_____

**KENNEDY, J., dissenting.**

{¶ 47} Because the majority's continued reliance on this court's decision in *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d

425, ¶ 26, is contrary to the plain language of Prof.Cond.R. 8.2(a) and the right to free speech guaranteed by the First Amendment to the United States Constitution, I dissent. In *Gardner*, this court addressed DR 8-102 of the Code of Professional Responsibility, 23 Ohio St.2d 54, a rule that has since been abrogated. We held that pursuant to that rule, "an attorney may be sanctioned for making accusations of judicial impropriety that a reasonable attorney would believe are false." *Id.* at ¶ 31. We referred to that reasonable-attorney standard as an objective standard. *Id.* at ¶ 26. This court justified granting less protection to attorney speech in a disciplinary case than to the speech at issue in a defamation case on the ground that the state had a "compelling interest in preserving public confidence in the judiciary." *Id.*

{¶ 48} The objective test handed down in *Gardner* was wrong when we adopted it in 2003. It improperly relieves a disciplinary authority of its burden to prove that the attorney's statement was false by instead requiring a showing that a reasonable attorney would *think* that the statement was false. That is, *Gardner* imposed a mere negligence standard in determining whether attorney speech about the judiciary was protected. However, after our decision in *Gardner*, we replaced the Code of Professional Responsibility with the Rules of Professional Conduct. Prof.Cond.R. 8.2(a) now establishes a different standard for determining whether a lawyer is subject to disciplinary action for statements made about a judge or other adjudicatory officer. It now prohibits lawyers from "mak[ing] a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judicial officer." The rule plainly adopts the "actual malice" standard that is required in defamation cases regarding public officials that *Gardner* refused to impose. This standard requires a greater showing of culpability than negligence. Moreover, the holding in *Gardner* is inconsistent with United States Supreme Court's precedent concerning free speech and the judiciary. In *Republican Party of Minnesota v. White*, 536 U.S. 765, 122

22

S.Ct. 2528, 153 L.Ed.2d 694 (2002), the court recognized that a law abridging speech that was intended to maintain the appearance of judicial impartiality was not narrowly tailored to advance a compelling state interest that justified the abridgment of the speech. In my view, *Gardner*'s objective test, which this court justified by tying it to the interest in preserving public confidence in the judiciary, fares no better.

{¶ 49} For these reasons, I would overrule this court's decision in *Gardner*. In place of its objective test, I would adopt a two-part inquiry for attorney-discipline cases involving statements that allegedly disparage the judiciary: (1) did the disciplinary authority prove that the attorney's statement was a false statement of fact and (2) if the statement is false, did the attorney make the statement with actual malice, that is, with knowledge that it was false or with reckless disregard for its truth. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Because relator, Cleveland Metropolitan Bar Association, did not prove that the statements made about members of this court by respondent, John Alex Morton, are false, I would dismiss the complaint brought against him in this case.

{¶ 50} "Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." *Lovell v. Griffin*, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

{¶ 51} Morton argues that both the United States Constitution and the Ohio Constitution protect his right to criticize members of the judiciary. "[T]he United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus. However, "[t]he Ohio Constitution is a document of independent force." *Id.* And we have recognized

that the free-speech provision of Article I, Section 11 of the Ohio Constitution affords greater protection than the free-speech provision of the First Amendment to the United States Constitution. *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 19. Nonetheless, we need not break new ground to reach the issue whether the Ohio Constitution protects Morton's right to criticize this court in zealously representing his client. For the reasons stated below, the binding precedent of the United States Supreme Court and the plain language of Prof.Cond.R. 8.2(a) provide ample reason to dismiss the allegations of misconduct against him.

{¶ 52} In *New York Times Co.*, 376 U.S. at 279-280, 84 S.Ct. 710, 11 L.Ed.2d 686, the United States Supreme Court held that the federal Constitution limits state power and "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." The court recognized that political speech about public officials is fundamental to our constitutional system, *id*. at 269, and "[a]uthoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker," *id.* at 271. Neither factual error nor injury to "the dignity and reputation of the courts," *id.* at 272-273, "suffices to remove the constitutional shield from criticism of official conduct," *id.* at 273. The court held that "a finding of negligence in failing to discover the misstatements * * * is constitutionally insufficient to show the recklessness that is required for a finding of actual malice." *Id.* at 288.

{¶ 53} In *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the court extended the *New York Times* standard to protect a prosecuting attorney's criticism of local judges that had resulted in criminal sanctions against

the attorney. The prosecuting attorney asserted publicly that a large backlog of pending criminal cases was due to those judges' "inefficiency, laziness, and excessive vacations" and that their failure to fund vice investigations raised " 'interesting questions about the racketeer influences on our eight vacation-minded judges.' " *Id.* at 66. The Supreme Court held that "even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood." *Id.* at 73. The court continued: "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. * * * [O]nly those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions." *Id.* at 74.

{¶ 54} In *Gardner*, we considered whether these principles from First Amendment law also extended to attorney-discipline cases. The attorney in that case asked a court of appeals to reconsider its adverse decision; in doing so, the attorney asserted in his filing that the panel of appellate judges was dishonest, result driven, and corrupt and possessed prosecutorial bias. *Id.*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 3-8. The attorney was charged with several violations of the former Code of Professional Responsibility, including DR 8-102(B), which prohibited a lawyer from "knowingly mak[ing] false accusations against a judge." He asserted that the court should adopt the actual-malice standard from *New York Times* to determine whether he acted knowingly. The court, however, looked to the majority rule among the states and adopted an objective standard, holding that "an attorney may be sanctioned for making accusations of judicial impropriety that a reasonable attorney would believe are false." *Gardner* at ¶ 31. We reasoned that "the state's compelling interest in preserving public confidence in the judiciary supports applying a standard in disciplinary proceedings different from that applicable in defamation cases." *Id.*

**{¶ 55}** The court's adoption of this objective test failed to give effect to the words of former DR 8-102(B), which prohibited *knowingly* making a false statement. And the court's objective test did not require proof that the statement was false; instead, it required a finding that a reasonable attorney would think that it was false. And even if the attorney was merely mistaken, the test handed down in *Gardner* permitted the disciplinary authority to prove that the attorney *knowingly* made a false statement by proving that the attorney was negligent in failing to ascertain the truth or falsity of the statement. However, an attorney who negligently fails to realize that a statement is false does not *know* that the statement was false. A reasonable-person standard reduces culpability to negligence and does not require any awareness of wrongdoing. *Elonis v. United States*, 575 U.S. 723, 738, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015).

**{¶ 56}** Effective February 1, 2007, we abrogated the Code of Professional Responsibility and adopted the Rules of Professional Conduct. Prof.Cond.R. 8.2(a) prohibits lawyers from "mak[ing] a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judicial officer." The rule adopts the actual-malice standard from *New York Times* that we rejected in *Gardner*. It does not subject an attorney to discipline for statements that an attorney "reasonably should know" are false, although the Rules of Professional Conduct use that standard in other contexts. *E.g.,* Prof.Cond.R. 1.10(a) and (b). By requiring that a relator in a disciplinary case prove that an attorney was reckless when making a false statement about the judiciary, Prof.Cond.R. 8.2(a) has superseded *Gardner*'s reasonable-attorney standard, which requires a relator to show only negligence to prove a violation.

**{¶ 57}** This language in Prof.Cond.R. 8.2(a) leaves no doubt as to whether an objective or subjective standard should apply when examining statements made by an attorney about judges. DR 8-102 did not clearly employ the *New York Times* language; that rule stated, "A lawyer shall not knowingly make false accusations

26

against a judge or other adjudicatory officer." The word "knowingly" was not defined in the Code of Professional Responsibility; it was left for this court to define it, and we employed an objective, negligence standard. But Prof.Cond.R. 8.2(a) adopts the language of the *New York Times* subjective test regarding the knowledge of falsity: "A lawyer shall not make a statement that the lawyer *knows to be false or with reckless disregard as to its truth or falsity* concerning the qualifications or integrity of a judicial officer * * *." (Emphasis added.) This language requires the court to consider the attorney's state of mind at the time of making the statement and is inconsistent with a reasonable-attorney standard.

{¶ 58} Therefore, by adopting the *New York Times* standard regarding knowledge of falsity, Prof.Cond.R. 8.2(a) requires the subjective analysis of an attorney's allegedly false statements. As the Supreme Court has explained, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). That is, actual malice requires a "high degree of awareness of [the statements'] probable falsity." *Garrison*, 379 U.S. at 74, 85 S.Ct. 209, 13 L.Ed.2d 125.

{¶ 59} Even though *Gardner* construed a rule that has now been abrogated, the majority today overlays its holding onto the different language of Prof.Cond.R. 8.2(a) to again apply a reasonable-attorney standard—a negligence standard—that does not require proof that the attorney's statement was false and that it was made knowingly or recklessly. "Knowingly" and "recklessly" are each higher degrees of culpability than negligence. *See generally Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 35.

{¶ 60} The adoption of Prof.Cond.R. 8.2(a) and that rule's reference to the *New York Times* standard is not the only reason to abandon the objective test from

*Gardner*. The reasoning of the Supreme Court of the United States in *Republican Party of Minnesota* does not support this court's reasoning in *Gardner* that preserving public confidence in the judiciary is a sufficient state interest justifying a content-based prior restraint on speech.

{¶ 61} In *Republican Party of Minnesota*, the court addressed whether judges' First Amendment rights could be restricted by a state's code of judicial ethics. Specifically, a provision of the Minnesota Code of Judicial Conduct forbade judicial candidates from " 'announc[ing] his or her views on disputed legal or political issues.' " *Id.*, 536 U.S. at 768, 122 S.Ct. 2528, 153 L.Ed.2d 694, quoting former Canon 5(A)(3)(d)(i) of the Minn.Code of Judicial Conduct.

{¶ 62} The court stated that "the announce clause both prohibits speech on the basis of its content and burdens a category of speech that is 'at the core of our First Amendment freedoms'—speech about the qualifications of candidates for public office." *Id.* at 774, quoting *Republican Party of Minnesota v. Kelly*, 247 F.3d 854, 861 (8th Cir.2001). The court applied the strict-scrutiny test, which requires the government to demonstrate that a restraint "is (1) narrowly tailored to serve (2) a compelling state interest." *Id.* at 775. A prior restraint is narrowly tailored when "it does not 'unnecessarily circumscrib[e] protected expression.' " *Id*. at 775, quoting *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).

{¶ 63} The court determined that the announce clause was unconstitutional because prohibiting a candidate for judicial office from declaring his or her views on disputed legal and political issues to the electorate during a campaign violated the First Amendment. *Id.* at 788. In reaching this conclusion, the court rejected the interests advanced by the state—"preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary"— and held that they were not sufficiently compelling. *Id.* at 775.

**{¶ 64}** In *Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 31, we justified requiring proof of negligence when examining an attorney's allegedly false statements—rather than requiring proof that the statements were made knowingly or with reckless disregard for the truth—on the ground that the state had a "compelling interest in preserving public confidence in the judiciary [that] supports applying a standard in disciplinary proceedings different from that applicable in defamation cases." However, the Supreme Court's decision in *Republican Party of Minnesota* demonstrates that the simple assertion of the need to protect the appearance of judicial integrity may not be a compelling interest sufficient to abridge an attorney's right to criticize a judicial officer.

**{¶ 65}** Rather, as the court explained in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), quoting *New York Times Co.*, 376 U.S. at 272-273, 84 S.Ct. 710, 11 L.Ed.2d 686, protecting judicial integrity is not a sufficient reason for " 'for repressing speech that would otherwise be free.' " "[T]he institutional reputation of the courts * * * is entitled to no greater weight in the constitutional scales." *Id.* at 842. "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192 (1941).

**{¶ 66}** In this case, Morton made statements critical of elected public officials regarding their integrity and qualification to serve in office. He therefore engaged in political speech—speech about the government and government officials. *Burson v. Freeman*, 504 U.S. 191, 196, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992). "Political speech, of course, is 'at the core of what the First Amendment is designed to protect.' " *Morse v. Frederick*, 551 U.S. 393, 403, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), quoting *Virginia v. Black*, 538 U.S. 343, 365, 123 S.Ct. 1536,

155 L.Ed.2d 535 (2003) (plurality opinion). *See also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (Kennedy, J., lead opinion) (noting that the speech at issue involved an attorney's words directed at public officials and their conduct in office but that "[t]here is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment") Such "[s]peech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. Fed. Election Comm.*, 558 U.S. 310, 339, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Therefore, "political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.' " *Id.* at 340, quoting *Fed. Election Comm. v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007). *See also Disciplinary Counsel v. Tamburrino*, 151 Ohio St.3d 148, 2016-Ohio-8014, 87 N.E.3d 158, ¶ 18 ("It is undisputed that Jud.Cond.R. 4.3 is a content-based regulation of political speech and therefore must withstand strict scrutiny * * *").

{¶ 67} If Prof.Cond.R. 8.2(a) is construed by this court to permit discipline for negligently made statements about the judiciary, it cannot withstand a strict-scrutiny analysis of its constitutionality. Importantly, the disciplinary authority has the burden to demonstrate that the attorney's factual statements were false, *see New York Times Co.*, 376 U.S. at 271, 84 S.Ct. 710, 11 L.Ed.2d 686, yet the rule allows an attorney to be disciplined for true statements that a reasonable attorney would *think* are false rather than requiring a finding of actual falsity. The rule is therefore overinclusive in that it prohibits true statements that attorneys should think are false, and it is underinclusive in that it does not prohibit statements that are false but that a reasonable attorney would assume to be true. *See Ladue v. Gilleo*, 512 U.S. 43, 52-53, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (noting that

30

underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech"). The application of the rule can be more narrowly tailored simply by removing our construction that it applies an objective, negligence standard and replacing that with what the plain language requires—actual malice. Therefore, the rule is not narrowly tailored to serve the interest—preventing false statements about the judiciary—furthered by it.

{¶ 68} *Gardner* has been abrogated by our adoption of Prof.Cond.R. 8.2(a), and anything that remains of it is too unconstitutionally infirm to salvage in light of the Supreme Court's decision in *Republican Party of Minnesota*. To hold otherwise would be to declare that political speech by judges is more protected than political speech by lawyers. That outcome cannot be constitutionally sound.

{¶ 69} "[A] fundamental understanding of constitutional democracy" is that "judges are not imperial." *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 21, *overruled by State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248. Statements made by judicial candidates are protected by the First Amendment as political speech: the First Amendment prohibits states from providing for judicial elections " 'under conditions of state-imposed voter ignorance.' " *Republican Party of Minnesota*, 536 U.S. at 788, 122 S.Ct. 2528, 153 L.Ed.2d 694, quoting *Renne v. Geary*, 501 U.S. 312, 349, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (Marshall, J., dissenting). In contrast, *Gardner's* objective standard burdens and chills the political speech of attorneys, who must think twice before criticizing a prior judicial ruling out of concern that it might subject the attorney to discipline. Silencing criticism of the judiciary, however, does not serve the governmental interest in public confidence in the court system: " '[t]he First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.' " *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011), quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503, 116 S.Ct.

1495, 134 L.Ed.2d 711 (1996) (lead opinion). Because depriving the public of information about the judges it elects—information that a reasonable attorney would not dare to utter even if true—does nothing to advance a compelling state interest, I would overrule *Gardner* today.

{¶ 70} I would dismiss the complaint against Morton based on the plain language of Prof.Cond.R. 8.2(a). Morton makes assertions of fact that only Chief Justice O'Connor, Justice French, and I could know to be true or false. He asserts that Justice French and I decided *Moskowitz v. Cuyahoga Cty. Bd. of Revision*, 150 Ohio St.3d 69, 2017-Ohio-4002, 78 N.E.3d 870, for political reasons and that Chief Justice O'Connor delayed a decision in that case until new members of the court came on the bench. A reasonable attorney might assume these assertions are false, but that is not clear and convincing proof of the subjective motivations of members of this court in deciding *Moskowitz*. There was no evidence presented in this disciplinary proceeding that Morton's statements are indeed false. Chief Justice O'Connor, Justice French, and I were not asked to provide testimony to establish that Morton's statements had no basis in fact, and I cannot use my own knowledge of my motivations to establish a fact not proven below. And although the majority points out that Morton "made *no* investigation and relied solely upon his own interpretation of the facts in making his statements" (emphasis sic), majority opinion at ¶ 23, the Supreme Court has held that "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Relator therefore failed to prove that Morton made false statements with actual malice.

{¶ 71} Our country has a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.*, 376 U.S. at 270, 84

S.Ct. 710, 11 L.Ed.2d 686. Based on this fundamental principle, I would overrule *Gardner* and hold that attorneys are subject to discipline only for statements that disparage the judiciary when they are (1) proven to be a false statement of fact, and (2) the statement was made with actual malice—with knowledge that it was false or with reckless disregard for its truth. In this case, there is no evidence that Morton made false statements either with knowledge or with a reckless disregard for the truth about members of this court, and therefore I would dismiss the complaint alleging that he committed professional misconduct. Because the majority does not, I dissent.

———————————

**DEWINE, J., dissenting.**

{¶ 72} I just don't see it. Today, the majority suspends John Morton from the practice of law for saying some not-so-nice things about this court in a brief that he filed. My skin is not so thin as to think that such punishment is warranted. Nothing Morton said has been shown to be untrue. And neither the First Amendment nor our disciplinary rules allow us to punish an attorney just because something he says gets under our skin.

### *What Morton Said*

{¶ 73} Morton filed a jurisdictional memorandum asking this court to hear a property-tax case. The gist of his argument was that a previous decision of this court, *Moskowitz v. Cuyahoga Cty. Bd. of Revision*, 150 Ohio St.3d 69, 2017-Ohio-4002, 78 N.E.3d 870, had been wrongly decided. In Morton's view, the *Moskowitz* court had incorrectly placed the burden on the taxpayer to show that the value assigned to a property by a county's fiscal office was incorrect.

{¶ 74} In support of this claim, Morton analyzed the caselaw cited in *Moskowitz* and argued that this authority did not support the legal conclusion reached by the court. In addition to presenting his legal argument as to why

*Moskowitz* was wrongly decided, Morton speculated as to the reasons for the court's purported error. And here is where he got himself into hot water.

**{¶ 75}** Morton (correctly) took note of the fact that the *Moskowitz* case took an extraordinarily long time for this court to decide. He pointed out that the case had been argued before one of this court's master commissioners on December 3, 2015, but that no decision was issued until May 30, 2017. He also noted that the delay meant that two new justices (including the undersigned) replaced two justices who had retired while the case was pending. Morton reviewed decisions authored by the justices who had been replaced and asserted that they likely would have been more favorable to his client's position than their replacements.

**{¶ 76}** Morton blamed the chief justice for the delay in deciding *Moskowitz*, saying that "it would not have been tolerated without her approval." And he speculated that the motivation behind the decision in *Moskowitz* was to advance Justice French's future leadership of the court. Morton then critiqued several opinions authored by Justice French, including *Akron City School Dist. Bd. of Edn. v. Summit Cty. Bd. of Revision*, 139 Ohio St.3d 92, 2014-Ohio-1588, 9 N.E.3d 1004 (French, J., dissenting), and *Schwartz v. Cuyahoga Cty. Bd. of Revision*, 143 Ohio St.3d 496, 2015-Ohio-3431, 39 N.E.3d 1223 (French, J., dissenting), and he concluded that Justice French had "persistently and incorrectly maintained that this Court should defer" to taxing authorities. Noting that Justice Kennedy had joined Justice French's dissent in *Schwartz*, Morton opined that "Justices French and Kennedy thereby showed a willingness to favor the government, at the expense of the taxpayer and the Constitution, no matter how unreasonable the government's view of the true value of the subject property."

**{¶ 77}** He summed it all up with some strong claims: the "political goal of the *Moskowitz* Court was to maximize government revenue, at the expense of the taxpayer, and his or her Constitutional right to limited taxation" and "the political

agenda of the *Moskowitz* Court was the promotion of the leadership of Justice French on this Court."

{¶ 78} What Morton said wasn't very respectful. One can certainly disagree with his analysis of the cases cited in his brief. And some of what he said was based on some fairly wild speculation. But I am not convinced that it is grounds for a suspension from the practice of law.

### *Punishing Attorney Criticism of Judges*

{¶ 79} Judges don't like to be criticized. (Indeed, who does?) But judges are public officials. And if the First Amendment protects anything, it protects the right of citizens to criticize their government.

{¶ 80} The United States Supreme Court has recognized that judges don't have a special dispensation to punish attorney speech they dislike; instead, "[t]he law gives '[judges] as persons, or courts as institutions * * * no greater immunity from criticism than other persons or institutions.' " (Ellipsis in original.) *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), quoting *Bridges v. California*, 314 U.S. 252, 289, 62 S.Ct. 190, 86 L.Ed. 192 (1941) (Frankfurter, J., dissenting); *see also Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

{¶ 81} In *Garrison*, the Supreme Court held that the actual-malice standard first adopted in *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), applied to attorney speech critical of the judiciary. Speech directed at official conduct, the court explained, was the "essence of self-government." *Garrison* at 75. And the commitment to wide-open debate about public issues embodied in the First and Fourteenth Amendments protected "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.*, quoting *New York Times v. Sullivan* at 270. Though *Garrison* arose out of a criminal prosecution, there is nothing in the opinion that limits its reach to that context. To the contrary, its holding that the judiciary may not stifle

unflattering speech to protect its reputation applies with the same force to attorney-discipline proceedings.

{¶ 82} Thus, it should not be a surprise that our Rules of Professional Conduct adopt the *New York Times v. Sullivan* standard. Prof.Cond.R. 8.2(a) provides: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judicial officer * * *." This echoes almost precisely the holding of *New York Times v. Sullivan*: a statement is made with actual malice when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280.

{¶ 83} In adopting the *New York Times v. Sullivan* standard, this court followed the lead of the American Bar Association ("ABA"). Model Rule 8.2 of the ABA Model Rules of Professional Conduct 8.2 says that "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard to its truth or falsity concerning the qualifications or integrity of a judge." ABA, *Model Rules of Professional Conduct*, Rule 8.2 (1993). Not only does the ABA rule recite the actual-malice standard, but in the background to the rule, its drafters explicitly stated that false statements about judges are held to the same standards as those concerning other public officials. *See Model Rules of Professional Conduct, Proposed Final Draft*, 206 (1981).

{¶ 84} Despite explicitly adopting the actual-malice standard, we have drifted away from the application of that standard in our Prof.Cond.R. 8.2 jurisprudence. Under *New York Times v. Sullivan*, a subjective standard applies to measure whether a false statement is made with knowledge of or with reckless disregard for its falsity. We have held, however, that a "reasonable attorney" standard—or objective-malice standard—applies to determine whether a statement is made with knowledge of or reckless disregard for its falsity. *Disciplinary Counsel v. Gardner*, 99 Ohio St.3d 416, 2003-Ohio-4048, 793 N.E.2d 425.

{¶ 85} As the other dissenting opinion demonstrates, this objective-malice standard is incompatible not only with the text of Prof.Cond.R. 8.2(a) but also with the First Amendment. *See Garrison*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125. And there is equally good reason to think that such a standard runs afoul of the Ohio Constitution. *See* Ohio Constitution, Article I, Section 11 ("Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech * * *"). I agree with the other dissenting justice that we should overrule *Gardner* and its objective standard. But even under the objective standard, it is clear that Morton may not be sanctioned for his comments.

### *Even Under the Majority's Objective-Malice Standard, Morton is Not Subject to Discipline*

{¶ 86} Though I agree that we should return to an actual-malice standard for attorney-discipline cases, it is not necessary that we do so to find that Morton's speech is constitutionally protected. The malice standard deals with a speaker's knowledge or recklessness in making a *false* statement. *New York Times v. Sullivan*, 376 U.S. at 280, 84 S.Ct. 710, 11 L.Ed.2d 686. Here, though, there has been no showing that Morton's statements are false. Moreover, as I will explain, his statements are best understood as statements of opinion based on fully disclosed facts. And regardless of whether we apply an actual-malice standard or the majority's objective-malice standard, such statements are entitled to constitutional protection.

{¶ 87} The fact that some courts have found it appropriate to apply an objective-malice standard for attorney criticism of judges doesn't mean that other First Amendment protections do not apply. *Standing Commt. on Discipline of the United States Dist. Court for the Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1438 (9th Cir.1995); *Berry v. Schmitt*, 688 F.3d 290, 302-303 (6th Cir.2012). Thus, "attorneys may be sanctioned for impugning the integrity of a judge or the court

only if their statements are false; truth is an absolute defense." *Yagman* at 1438, citing *Garrison*, 379 U.S. at 74, 85 S.Ct. 209, 13 L.Ed.2d 125; *accord Berry*, 688 F.3d at 303; *Iowa Supreme Court Attorney Disciplinary Bd. v. Weaver*, 750 N.W.2d 71, 81 (Iowa 2008); *State ex rel. Oklahoma Bar Assn. v. Porter*, 766 P.2d 958, 969 (Okla.1988). As the Supreme Court explained in *Garrison* at 74, "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned."

**{¶ 88}** Further, disciplinary counsel bears the burden of proving falsity. *See Yagman* at 1438; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *see also Disciplinary Counsel v. Squire*, 130 Ohio St.3d 368, 2011-Ohio-5578, 958 N.E.2d 914, ¶ 34 ("In attorney disciplinary proceedings, relator bears the burden of proving, by clear and convincing evidence, the facts necessary to establish a violation of a Disciplinary Rule").

**{¶ 89}** Here, nothing that Morton said was demonstrably false. This court doesn't explain why some cases take longer to decide than others—and it certainly offered no explanation for the delay in issuing the *Moskowitz* decision. So, we can't proclaim his theory for the delay to be false. And while we may bristle at Morton's characterization of our motivations as "political," there is nothing that objectively disproves the characterization. Indeed, the majority offers its own possible cause of the delay (record numbers of tax appeals in the three to four years before the decision in *Moskowitz* was issued) but presents no more proof for its explanation than does Morton.

**{¶ 90}** Moreover, Morton didn't just make accusations. He explained the basis for them. He rooted his assertion that the process was being manipulated for political ends and to foster Justice French's leadership in this court's extended delay in deciding the *Moskowitz* case. And he cited judicial opinions—complete with

case citations—to support his opinion that the named justices favored "the government, at the expense of the taxpayer and the Constitution."

{¶ 91} Morton's assertions are best understood not as false statements but rather as statements of opinion based on fully disclosed facts. *See In re Green*, 11 P.3d 1078 (Colo.2000). And these types of statements are widely understood to be entitled to constitutional protection. *See, e.g., Berry*, 688 F.3d at 303-305; *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir.1998).

{¶ 92} The Colorado Supreme Court's decision in *In re Green* illustrates this point. There, in the course of an ongoing proceeding, an attorney wrote several letters to the judge with copies to opposing counsel and filed a motion to recuse the judge. In these writings, the attorney leveled a number of charges at the judge, including labeling him as a "racist and bigot" and accusing him of an unfavorable "bent of mind." *Green* at 1082. The Colorado high court concluded that because the attorney's writings "disclose[d] fully the facts upon which [the attorney] based his opinion," they could not be actionable. *Id*. at 1085. "We view Green's statements * * * as statements of opinion based on fully disclosed and uncontested facts," the court explained. *Id*. at 1086. Accordingly, the court could not, "consistent with the First Amendment," discipline the attorney "for his subjective opinions, irrespective of our disagreement with them." *Id*. And because the accusations constituted statements of opinion, the court found it unnecessary to reach the issue of malice.

{¶ 93} Of a similar ilk is the Ninth Circuit's decision in *Yagman*, 55 F.3d 1430. There, the court explained that under the First Amendment, "[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Id*. at 1439. The rationale is straightforward: "When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of

additional, undisclosed facts." *Id.* Such a statement " 'reveals its lack of merit' " and " 'readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.' " *Id.*, quoting *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir.1985).

{¶ 94} Thus, in *Yagman*, the Ninth Circuit found that even under the objective-malice standard applied by the majority today, an attorney could not be sanctioned for calling a judge anti-Semitic and accusing the judge of having a penchant for sanctioning Jewish attorneys, because the attorney disclosed the facts upon which he drew these inferences. *Id.* at 1440.

{¶ 95} Similarly, the Sixth Circuit has adopted the objective-malice standard for attorney speech, but it too has found that an opinion based on fully disclosed facts cannot constitutionally form a basis for attorney discipline. *Berry*, 688 F.3d at 303. Thus, the court held that Kentucky officials strayed beyond constitutional boundaries when they disciplined an attorney under that state's version of Prof.Cond.R. 8.2(a) for criticizing an investigation conducted by an adjudicatory body. Because the attorney "provided the public with the facts upon which his opinion relied," the public was "free to investigate * * * and draw its own conclusions." *Id.* at 304.

{¶ 96} The same holds true for Morton. Morton didn't pretend that he had some secret information about the inner workings of the court and the motivations of individual justices. He laid out the facts supporting his premises for all to see. Thus, a reader of Morton's jurisdictional memorandum would have seen not only Morton's conclusions but also the thin reed on which they rested. The reader could decide for himself whether the delay in issuing the *Moskowitz* opinion demonstrated that the court's motivations were political. And the reader could read the opinions cited by Morton and determine if they, in fact, supported his assertion that the named justices favored "the government, at the expense of the taxpayer and the Constitution."

{¶ 97} Morton has not been shown to have made any false statements. And he fully disclosed the facts upon which his opinions about this court were based. Thus, the First Amendment precludes this court from disciplining Morton for what he said about this court.

### To What End?

{¶ 98} In disciplining Morton, the majority runs roughshod on First Amendment protections, and for what? The closest the majority comes to providing any justification for the punishment it metes out are vague references to the need to protect the integrity of the judiciary. But even if such a concern were sufficient to override First Amendment protections (it's not, *see Garrison*), it is hard to see how punishing Morton does anything to advance that aim.

{¶ 99} Morton made his claims in a single filing to this court. No member of the public voiced any concern—indeed, this case presents the unusual situation in which a disciplinary committee filed a complaint on its own initiative without any grievance being filed. But for the filing of the disciplinary complaint, Morton's musings would have been largely unheard. Notwithstanding the majority's concern that Morton's filing is "readily accessible to the public on this court's online docket," majority opinion at ¶ 35, it's difficult to imagine that many members of the public would have made their way to his filing. Most likely, the only people who would have read Morton's charges would have been members of this court, our staff, and opposing counsel. The only reason that Morton's grievances will get any public attention at all is because the disciplinary committee chose to go after him and because this court chooses to punish him.

{¶ 100} So, the reason to discipline Morton can't be because he has somehow caused public harm to the reputation of the judiciary. And one has to assume that the motivation to discipline Morton isn't simply hurt feelings among members of this court. Rather, it must be because the majority wants to prevent

future Mortons from leveling similar attacks on this court. And therein lies the biggest problem with the majority's decision today.

{¶ 101} Our system of government is premised on the idea that citizens will serve as a check on the institutions of government. To this end, a "major purpose" of the First Amendment is to "protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). And, of course, "the operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Landmark Communications, Inc.*, 435 U.S. at 839, 98 S.Ct. 1535, 56 L.Ed.2d 1.

{¶ 102} The notion advanced by the majority today that it is appropriate to stifle speech to protect the public reputation of the judiciary has been emphatically rejected by the United States Supreme Court:

> The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

(Footnote omitted.) *Bridges*, 314 U.S. at 270-271, 62 S.Ct. 190, 86 L.Ed. 192. Thus, the Supreme Court has made clear that "speech cannot be punished * * * 'to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed.' " *Landmark* at 842, quoting *Bridges* at 292 (Frankfurter, J., dissenting).

{¶ 103} No doubt, by disciplining Morton and others who disparage this court, the majority will make other attorneys think twice before they criticize us. What attorney wants to risk his very livelihood by saying something to which this court takes umbrage?

{¶ 104} Stifling attorney criticism comes at a high cost. Attorneys, by virtue of their education, training, and experience with the judicial branch, are in the best position to "recognize, understand, and articulate problems with the judiciary" and "to comment on the judiciary and judicial qualifications." Tarkington, *The Truth Be Damned: The First Amendment, Attorney Speech, and Judicial Reputation*, 97 Geo.L.J. 1567, 1601. This is precisely the information that the public needs "to make informed decisions about the judiciary, to fulfill the self-governing role, and check judicial abuses." *Id.*

{¶ 105} Today's decision will make attorneys hesitant to assert opinions critical of the court. Not just attorneys like Morton whose assertions some may consider outlandish, but also the more cautious and the more insightful. By chilling attorney criticism of the judiciary, we "forestall[] the public's access to the thoughts of the very class of people in daily contact with the judicial system" and "shield the judiciary" from those best situated "to advance knowledgeable criticism." *Porter*, 766 P.2d at 968. That's not good for self-government. And it's not consistent with the commitment to robust debate that is central to our First Amendment.

### *Conclusion*

{¶ 106} In disciplining Morton, the majority ostensibly acts to protect the public reputation of this court. But by placing concerns for its own reputation ahead of the constitutional principles we have sworn to uphold, the majority damages this institution in ways far more profound than any harm done by Morton. I dissent.

_____

Thompson Hine, L.L.P., Frank R. DeSantis, and Karen E. Rubin; and Heather M. Zirke and Christopher J. Klasa, Bar Counsel, for relator.

J. Alex Morton, pro se.

_____